We'll hear argument this morning in Case 13-11-5, Wood v. Moss. Mr. Gershengorn. Mr. Chief Justice, and may it please the Court. The Ninth Circuit held that individual Secret Service agents could be held personally liable for their on-the-spot decision to reposition a group of about 200 to 300 demonstrators who were within weapons range of President Bush as he made an unscheduled stop for dinner at an outdoor restaurant patio. Sotomayor, may I ask a question? So were the pro-Bush demonstrators. In fact, the pro-Bush demonstrators were across the street, pretty much at a diagonal to the President, and they were permitted to remain there the entire time. They had a throwing distance of a bomb or a shooting distance as well. So, Your Honor, the pro-Bush demonstrators were differently situated from the anti-Bush demonstrators in several fundamental respects. With respect to the weapons range, there was a two-story building between the pro-Bush protesters and the — where the President was dining. It's in stark contrast to the open alley that led down precisely to the 6-foot wooden fence behind which the President was dining, which is where the anti-Bush protesters were. That was at the second move, not the first. No, Your Honor. At the first move, when the President arrived for dinner, the pro-Bush protesters were on the north — the anti-Bush protesters were on the north side of California Street, between 3rd and 4th, and the alley that led right down to the restaurant patio was right there. They were at the head of the alley. So they were very differently situated from the pro-Bush protesters. Counsel, I don't understand the government to be making the argument, and I can't understand why it isn't making the argument, that it doesn't matter whether there was any intent to suppress anti-Bush demonstrations, that in this area, as in traffic stops, we don't consult subjective intent. If a policeman stops somebody and says, oh, you stopped me only because I was coming back from an anti-Bush demonstration, we wouldn't listen to that argument. We'd say, did you have a broken taillight or not? If you had a broken taillight, we do not inquire into the subjective intent of the officer. Why is it any different here? Your Honor, I don't believe we are avoiding the argument that Your Honor suggests. You haven't made it? We don't think it's — I think, Your Honor, with respect that we have, our position is that it is not clearly established law, that if there were an objectively reasonable — You don't even have to get into that. You don't have to get into clearly established law. It's a very simple case. If you say, was there objectively a reason to move these people, if there was, if you had an ulterior motive that was unconstitutional, we don't inquire into it. Your Honor, we agree with that. We just have framed it as terms of — in terms of clearly established law, that if we think along the lines of what this Court said in Reichle with respect to retaliatory arrest, if there is an objectively reasonable basis for the — for the movement, for the repositioning, such as a valid security rationale, it's not clearly established that the presence of animus would be enough to take — to raise a constitutional problem. Kagan Do you agree with that, Mr. Gershengorn, because you have these hypotheticals in the last page of the brief where you say that a complaint could survive a motion to dismiss if the Secret Service members had, you know, announced, had admitted that they had an intention to discriminate, or if they had told the local police that. So I took what you were saying there to say if there is evidence of a very clear nature that it was all about animus and it was nothing about security, then the complaint would survive. Gershengorn So, Your Honor, I think that the way we reconcile the two positions is the following. If there is no objective legitimate security rationale and it is animus, we agree that it would be clearly established law that the officers could not have taken — the agents could not have taken responsibility — could not have taken the actions. However, if on the record there is an objectively reasonable security basis, then we don't think it's clearly established that even if the individual officer didn't take the action for that reason and took it for animus, that it's not clearly established that that would stay in place. Kennedy But could you oblige us by answering Justice Scalia's question? Forget clearly established. What do you think the law is or ought to be if the only motive for the officer's action, for the Secret Service action, is one based on viewpoint discrimination but that nonetheless there was an objective reason that could have justified the action? What should the outcome be there as a matter of law? Forget clearly established. Gershengorn We don't think they've stated a constitutional violation in that context. However, what the Court did in Reichel — Kennedy I don't — what does that answer mean? Gershengorn That means there is no constitutional violation. Kennedy So you — so you say that in any time there is an objective basis for the Secret Service to act to move a protester, the fact that this wasn't the motive at all but that it was viewpoint discrimination is irrelevant. Gershengorn So, Your Honor, I want to —  Is that our position or is it not? Gershengorn That is our position, but I don't think that's what we need to win this case. Breyer No, I know that, but the reason that you — the reason I think these questions are being asked, my impression is exactly what Justice Scalia said in respect to a Fourth Amendment case against a police stop. But my impression also is that where you have a First Amendment case and it's not against the policeman, against the Secret Service, this Court has not said that. Am I right about that? And the reason that your position, if I am right, is relevant is because I think maybe we shouldn't say that for the first time in a case where the government hasn't even argued it. Gershengorn So, Your Honor, I — Breyer Now, what is the answer to what I just said? Am I right on Part 1 and am I right on Part 2? Gershengorn Your Honor, you are right on Part 1. The Court has never held it. What the Court — the closest the Court has come is in Reichle, where what the Court said was in a case of retaliatory arrest, it was not clearly established. The Court didn't reach the constitutional question. The Court said it was not clearly established that where there was objective probable cause for arrest, retaliatory animus was not relevant. We think a number of the same factors that motivated the Court in Reichle could motivate the Court here as well. Were they to reach that question, and I'll explain why in a sec, but we do not need to win on that question because it's not really established. Breyer You don't need to win on that question. The question is, should, in your opinion, the Court reach the constitutional question?  So, Your Honor — Breyer And my hesitation would be that it is one thing to talk about ordinary policemen. It is another thing to talk about First Amendment matters where we are engaged with a kind of special protective force. There are certain residences there that may — residences that may make a person hesitate to extend into that area, and so what is the government's view? Gershengorn So, Your Honor, I've been asked the government's view on a couple of things, so I want to be very clear. The question of what is our position is the position articulated by Justice Scalia. The question of what we need to win, it's qualified immunity. The question of whether the Court should reach the constitutional question, I think our answer would be no, that the parties haven't briefed it, as Your Honor said, that the normal course would be to do what the Court said in Reichle and say that it's not clearly established. But if the Court— Scalia I can't understand why you didn't brief it, then, in that case. I cannot understand why you didn't brief it. And talking about things that we haven't held in the past, we haven't even held in the past that there is a Bivens cause of action for a First Amendment violation, have we? Do we have any cases to sell that? Gershengorn No, and we agree with that, but the argument was not preserved below, so we have not presented it here. Roberts Is that a relevant — well, what is your position on that? Is it pertinent in analyzing qualified immunity that there's no private right of action for the asserted constitutional violation? Gershengorn We do believe, Your Honor, that it is a — the Court would have jurisdiction to reach it because it's a logically antecedent question and that it would be something that the Court could consider. It's not something that people— Roberts No, I don't mean what the Court could consider. I want to know whether or not — well, the question is simple. Can you only — can you not violate the Constitution if there's no right of action against you, or do you look and say, well, whether there's a right of action or not, it still violates the Constitution? Gershengorn Your Honor, I think that the presence — the Court's hesitant to recognize Bivens, and the factors that go into the — that gave the Court hesitance to extend Bivens to First Amendment claims are relevant to the analysis here. We didn't raise this argument because it wasn't preserved below, but we do think the very same factors that should — that would give the Court pause about recognizing a Bivens action are the ones that would cause the Court to reverse the Ninth Circuit's decision here. Kennedy On the merits of the case, if you were called to brief the Secret Service, what would you say in response to this question? Do we have any duties under the First Amendment when we are protecting the President with respect to crowds and — and people that are close to him? Do we have any First Amendment duty? Gershengorn Your Honor, we would — first of all, as a — the policy — I know Your Honor has said, we don't want to prevent the Secret Service from doing that, an internal policy. With respect to what the Constitution — Kennedy They're asking about the law. They say, we want to know what the law is. We're law enforcement officers. Will you please tell us what the law is? Gershengorn I would say, Your Honor, that the law is not clearly established. This Court has never held that the Secret Service —  He said, that's why we've invited you to lunch, so that you will tell us what the law is. Gershengorn I understand that, Your Honor. And I — and we may yet get clarity, but as I think it's arguing that it's not. Kennedy Could I — could I ask you to re-answer Justice Kennedy's question, please? Gershengorn We would tell — I think I would have to say in candor, Your Honor, that in part because of some of the discussion we're having, that we think the better view of the law would be if you have an objective security rationale for the — for the action, that the retaliatory animus would not render that unconstitutional. I would have to say that that's not clearly established. And there's a — Sotomayor Do you think it's not clearly established that you can't discriminate solely — I've nothing. You can't discriminate solely on the basis of viewpoint? Gershengorn That's correct, Your Honor. We agree with that. Sotomayor That's constitutionally established. Gershengorn I take that as different from the hypothetical that Justice Scalia put forth. Sotomayor No, no, no. Gershengorn Okay. Yes. Sotomayor Let me go step by step. Gershengorn We agree. Sotomayor You agree that's clearly established? Gershengorn Yes, Your Honor. Sotomayor All right. What you don't think is clearly established is a mixed motive case. Gershengorn That's correct. Sotomayor That's a different issue. So the question here is, is this a mixed motive case or not? Gershengorn Your Honor, the other side, I think, is saying it's not, that there was no valid security reason, no objective security reason for this move. Sotomayor And I think our response to that, Your Honor, is we would agree that's clearly established. If there were no — if no reasonable officer could believe there was a security rationale and it was only on the basis of animus, then it would be clearly established. Scalia That's not a mixed motive. Why do you accept the description of that as a mixed motive case?  I don't think that's — I don't think, Justice Sotomayor — Scalia If you agreed with my hypothetical, the point is it doesn't matter what the officer's motive was. It does not matter. If there's an objective basis for a traffic stop, even if his sole motive was discriminatory, the stop is nonetheless valid. Gershengorn Your Honor — Scalia Isn't that a mixed motive issue? Gershengorn I took Justice Sotomayor to be asking me a different question. If there is no objective security rationale, which takes it out of Your Honor's hypo, then we agree it is clearly established and we believe this complaint fails because they have failed to satisfy Iqbal. Scalia And don't — don't just don't call it mixed motive. Gershengorn No, that I don't think is mixed motive. But what Justice Sotomayor was asking was I thought something different, which is that whether there is a sort of Mount Healthy but-for causation. And I would say — I just want to be very clear what our position is here. I know I'm being asked on the merits, but just to get out the position on qualified immunity. It is not clearly established that taking viewpoint discrimination into account in a security situation violates the Constitution. It is not clearly established that if there is objective security rationale, even if you act then in animus, that that would violate the Constitution. But we agree — Roberts Justice Alito has been trying to get a question out of me. Gershengorn I'm sorry. No, no. It's certainly not your fault. I have this question about the — just the issue that you've been addressing in response to Justice Scalia's question. In the Fourth Amendment context, where it is purely — the inquiry is purely objective, we have case law on what is reasonable suspicion, what is probable cause. Now, if you apply that to a First Amendment case where there are — where it's asserted that there is a security — there may or may not be a security concern, would it not be necessary for us to identify a — a degree of suspicion or probable cause that the Secret Service would have to have before making — before moving people for security reasons? I mean, I imagine whenever the President is out in public, there is some degree of risk. You want no risk, you know, keep him in a bunker. So at some point, do you see what I'm saying?   Thank you, Your Honor. Alito The Secret Service has to make a decision about how much information they need before they can — they should move people or change a route or something like that. So the courts would then have to set that standard. Gershengorn Your Honor, I think it would have to be a very deferential standard, and it would — and I think that that is proper under this Court's case law. If I could take — attack that in sort of two ways. The way the Court addressed this issue in Reichel, we think, is quite parallel to how it would address it in this First Amendment context. What the Court said in Reichel was, first, the existence of probable cause in that case is likely to be an issue in every — in virtually every case. And we think in this situation, the existence of a legitimate objective security rationale, in part because that's what the agents do and in part because of statute that requires the agency to protect the President, a legitimate security rationale is likely to be in every case, first. Second, what the Court said in Reichel was that it's very difficult to distinguish animus from the proper use of reliance on protected speech because — because the Court has recognized that it is valid at times to take into account the nature of one's speech in — in making arrest and other security decisions. And the same would be true here. And we think there's a third factor here which is important, which this Court has recognized, that the physical security of the President occupies a special place in our constitutional structure, as Justice Breyer put it in his Rubin dissent, and that the Secret Service has a special role to play. Mr. Gershengorn — Would you say that under your view of the case, that there is a First Amendment interest that protesters have, but that it is virtually unenforceable in the context of crowd control? No, Your Honor, we would not say that. We think there are — Because it seems to me that if this complaint doesn't survive, nothing will. So, Your Honor, I'd like to address that in a couple of different ways. First of all, there's a very big difference between whether there's a Bivens action stated and whether there are other ways to enforce constitutional rights. So there — it is possible, and there have been suits that have sought injunctive and declaratory relief before things like inaugurations, political conventions, even just regular presidential visits. Those would be unaffected. Second, there are — there are situations in which plaintiffs, and there are pending challenges now, have challenged Secret Service policies. For example, a Secret Service policy that no — that bars certain supports for signs from the parade route. That's being challenged now in the Court. And then, if there are Bivens claims, we think there are allegations that would survive. But we do recognize that this would — that a ruling on qualified immunity here would cut back on damages claims against individual agents. But we think that's appropriate in light of the difficulties they face. The — Mr. Kagan — You know, I really — I really don't understand what the government's doing here. It seems to me you want to win this case, but not too big. In light of the arguments waved below and the arguments not made here, you want us to find for you, but on the narrowest possible ground, I would think it is in the interest of the United States and the Secret Service to say there are no Bivens First Amendment actions, but you don't make that argument, didn't make it below, don't make it here. Likewise, it would be in their interest to say, oh, this is just like a traffic stop. It doesn't matter whether we had a bad motive, so long as there was an objective reason, that's the end. But you don't make that argument here either. I really can't understand what the government's trying to do here. Your Honor, we are — we are doing our best to make with the arguments that we have before the Court. We think that the — that the qualified immunity standards that we have articulated and the position on clearly established law we have taken is sufficient for this claim, although, as I've tried to say, we agree with both of the propositions that Your Honor has said, and in a properly preserved case, we would argue it best. Kagan. Mr. Gershengorn, suppose that we change the facts here and that both the pro-Bush demonstrators and the anti-Bush demonstrators were in the same place and they were at the foot of the alleyway so that there was an objective security rationale, but that the Secret Service members, and they were in all respects the same except that they had different signs. Some signs say the President is great and some signs say the President is terrible. And the Secret Service members had only removed the ones with the signs that said the President is terrible. So what would your analysis of that be, both under clearly established, but also I want you to get to what you think the law is there. All right. So under clearly established, Your Honor, I think we do think that that would make a plausible case that the agents acted without a valid security rationale because they, because they moved the anti-Bush demonstrators. Well, I think you're changing my hypothetical. Or let me just explain my hypothetical. I put them both at the foot of the alleyway because that meant that both have a straight shot, you know, that they can throw a grenade into the patio, which is, I take it, what the nature of your objective security consideration is. So that's true of both of them. But you only move the ones that say the President is terrible. So we would say, Your Honor, first on clearly established, that it is not clearly established that the agency couldn't do that. But we recognize that the Court is concerned about that situation where an agent has an objective security rationale but acts solely on the basis of animus. And I think it would support that kind of inference. But I would urge the Court to think, as it thinks about it, about the Flip case, which is an agent who has an objective security rationale. But just tell me what your answer to that case is. The answer is it would not be clearly established. And do you think it would be unlawful? Forget clearly established. The government's position is, if, although we haven't briefed it in this case, the government's position would be the one articulated by Justice Scalia. But we recognize that is not something that the Court has yet held. I don't think that's responsive to Justice Kagan's hypothetical. Justice Scalia's hypothetical, there is an objective reason for stopping the car. It's violating traffic regulations, which is the broken taillight. I understood my colleague's question to be, there is no objective security rationale. I'm sorry. I had understood it differently. Did you believe? I thought you were saying there was an objective security rationale. I'm saying both can throw a grenade into the patio area. But in fact, you only remove the people who have the anti-President signs. Notwithstanding that the security consideration applies to both equally. So I took that to be that there is an objective security rationale. And I think in that situation, we would say that the, A, it's not clearly established. But that we believe that the better answer is the one from Justice Scalia, because there is an objective security rationale. No. I thought the question was, there is no differential security rationale. In other words, maybe it's not the question my colleague asked. No. I'll ask it. Let's say you have to move the President in an emergency situation. You've got two options. Go through the anti-Bush crowd or go through the pro-Bush crowd. And you've got to do it right away. Is it a justified security rationale to say that we think it's more likely that it will be problematic if you evacuate the President through the anti-Bush crowd than through the pro-Bush crowd? We do not think that would be unconstitutional, Your Honor. So in other words, the viewpoint itself constitutes a security consideration? That's what this Court said in Riegel, that there are times, not that inevitably it's not. And so that your answer to Justice Kagan is that it would be proper, if you have only 15 minutes, limited amount of time, to move the people with the adverse – with the signs that criticize the President? That's correct, Your Honor. We think that that would be, but. Justice Kagan is that there is no violation if they move just the Bush protesters. That's your answer. That's correct, Your Honor. But I – and if I could just say a word or two about. No. I thought what the Chief was going to say. There's no differential reason to move one or the other. Let's assume you have an equal amount of time, you can get everybody moved, and you just are choosing to move the Bush, anti-Bush demonstrators. Your Honor, I understand that this is an unattractive hypothetical for the government's position. And if I could explain why, nonetheless, I think it's the right answer, because the flip side is if you have an agent who has a legitimate security rationale and is going to move against somebody who's hostile, who's showing a message that's going to be a threat, then you have to have a reasonable agent to hesitate. That's what this Court said in Hunter. The Court said in Hunter there are times when we don't want a reasonable official to hesitate before he acts, and nowhere is that more important than when the specter of presidential assassination is in order. But I want to be crystal clear that we don't need that. I think I've said that before, but I just want to make sure that we don't need that to win. It just has to be clearly established. I mean, suppose I add to my hypothetical, and I say the Secret Service goes to the local police and says, you know, doesn't talk about grenades at all, and really just says, we have got to get these anti-President people out of here because they're annoying the President. Let's do it right now. And that's what they do. I think, Your Honor, that at some point you would cross over into a position where you would say there is a real question about whether there's an objective security rationale, and we would be in the situation. I mean, there is one in a sense of, as we look back, we can see that there's an alleyway and that somebody could have a grenade, but there's evidence that that's not at all what was in the heads of the Secret Service members. Your Honor, I recognize that that is, as I said, I think that is a — that is the hardest case for us, and I recognize that's why Your Honor posed it. But I urge Your Honor to think about it from the flip side, which is if you adopted the rule that Your Honor's question would — not attributing to you, but might lead one to adopt, that the result is an agent who has a legitimate security rationale, but is operating against people who are expressing a viewpoint must hesitate. And I think it's important in this context to remember that what we have are Secret Service agents who are making on-the-spot judgments while protecting high-level officials. Breyer. We understand that, and I think that that's the problem, and I think you're being sort of picked at for this reason in my mind. And I don't know if you have an answer to this. No, everyone understands the importance of guarding the President in this country. Everyone understands the danger. You can't run a risk. At the same time, no one wants a praetorian guard that is above the law. And we have examples of history of what happens when you do that. So everyone is looking for some kind of line that permits the protection but denies the praetorian guard. And if you have anything to say that we're immersed in details about how to get to that general objective, I would love to hear it from either side. Your Honor, very briefly, then I'd like to reserve. I think the simplest way to reserve it is actually to — to resolve this is to hold that it's not clearly established that it's a mixed motive case. It is not clearly established that the situation Justice Scalia posed would be unconstitutional, and that under Iqbal, that the plaintiffs have not alleged what they would need to allege under clearly established law, that it was the sole motive for their actions and there was no objectively reasonable security rationale. I'd like to reserve the balance, Your Honor. Thank you, counsel. Mr. Wunker. Mr. Chief Justice, and may it please the Court. The plaintiffs have pled a plausible claim for intentional viewpoint discrimination in violation of core First Amendment principles. We've done so for three interrelated reasons, and we've pled it as a sole cause. This was solely the cause, not security rationale, but the sole cause of the plaintiffs' claim, and the sole cause of the move here was the viewpoint being expressed. Would you have taken the same position if all there had been was the first move, that is, the move to Fourth Street, then there would have been about an equal distance from the pro-President demonstrators? I think that would be a more difficult case for us to prevail because we wouldn't have one of the prongs on which we rely, which is the disparate treatment, as one of the factors we rely on to establish the inference of intent. But then would you say that you would have no tenable case if they moved them just the one street over so they wouldn't be in a position to throw a hand grenade to the patio? I think as a practical matter, we would likely not have as tenable a case as we do. If, in fact, the only reason for the move was the officer's intent to move the anti-Bush demonstrators further from where they were so that they could be heard less well, that would, in our view, state a claim for relief. It would be a more difficult claim because we are trying to establish intent and we're trying to establish intent from the inferences from the various facts that we have. Scalia, do you acknowledge that the issue here is whether the law was clearly established? Do you agree with that? I think we believe the law was clearly established by this Court's precedent. I'm not saying whether you believe it. If you find it wasn't clearly established, do you lose, is what I'm saying. Well, I think this Court's qualified immunity precedents make that clear. Say that, okay. Now, how can it be clearly established if we have never held that there is a Bivens cause of action for a First Amendment violation? We've never held that. How can you possibly say that the violation here is clearly established? I think you can, Justice Scalia, find from this Court's decisions in its viewpoint discrimination holdings, like Rosenberger, like RAVV St. Paul, like Pinette, where the Court has clearly made it clear that viewpoint discrimination is a pernicious form of protection. Oh, it is pernicious, but is there a Bivens action for it? The Constitution does not create a cause of action for this. 1983 doesn't cover this. We invented it out of the — really out of nothing. And we have not extended that to First Amendment violations up to now.  And that argument was not made below, nor preserved below. Well, regardless of whether it was made below, it certainly goes to the argument that was made below and here that the violation here was not clearly established. Well, I think it's different to say whether or not there is a remedy for the violation as to whether the violation was clearly established. The violation was clearly established. Whether or not there is a remedy for that violation under Bivens is a different question. That's a good point. Mr. Wilker, let's say something happens back in the patio area where you — you're the head of the Secret Service detail. You've got to evacuate the President right away. Do you go through the anti-Bush crowd or through the pro-Bush crowd? You've got to decide right now, quickly. Well, I'm serious. You have to make a split-second decision. Which way do you go? I think whichever way provides the clearest egress. No, no, they're both the same. That was one of your propositions, that there's no way to distinguish there. It's too late. You've taken too long to decide. It's a serious point. You've got to decide like that. But that's not the position that — that's not the position the agents were in on October 1st. No, I know. But if you're trying to decide whether viewpoint can ever be a security justification, we have to consider all of the possible situations. So again, if you have to decide right now, do you go through the anti-Bush crowd or the pro-Bush crowd? Guns are going off, explosions. Which way do you go? I truly don't know the answer to your question because I'm not a security expert. Really? I don't know where the guns are coming from. You're the farthest thing from a security expert. If you don't know the answer to that one. That's actually not much of an answer for lots of reasons. But the most, if you don't know, how are we supposed to know? Because that's not the issue that's presented to this Court for decision today. This is not a case in which the Secret Service made a split-second judgment as to which evacuation route to take with the President. Well, but with respect, my point is that we do have to adopt a general principle. And if we say viewpoint can never be a consideration, then you have to say when there's an emergency going on, it's just as likely there will be a problem if we go through the pro-Bush demonstrators or the anti-ones, which seems to me to be on its face implausible. Well, in the context of an emergency, there may be a different rule than there would be in the context of a considered decision to take viewpoint into account in making a decision, which is what we have alleged here. So then you think there, well, there may be situations in which viewpoint alone may be a security consideration. There may be. And I think if there were individuals directly in proximity to the President, not, you know, 90 feet or 80 feet away, but directly, could the Secret Service take into account? I think that's what this Court said in Reichle, is that the Court can take into account where it said in the proximity of the President, or in that case the Vice President. Mr. Woker, do you concede that, looking back on this, just in a hindsight kind of way, that there is an objective security rationale here, that they're standing at the foot of the alleyway, that you could throw a grenade into the patio area? Do you concede that just looking at the situation and not thinking, not taking into account any evidence of what was in their heads, that there, in fact, is an objective security rationale for moving people from this area? I think if you — if the concern was the mouth of the alley and that the riot-geared police guarding the mouth of the alley were not sufficient to protect the alley and protect against that kind of incursion, the more simple solution in this case would have simply been to move people slightly to the east or west where they had buildings between them and the President. But the question is what is — there are so many different theories floating in this case that I've had a hard time trying to figure out what you want me to decide on what theory do you want me to decide. Is your allegation that the Secret Service agents were motivated in part by security reasons and in part by bad, what you would say bad, viewpoint reasons, or is your theory the Secret Service was motivated only by viewpoint and zero by security? It's the latter. It's the latter. Okay. So then if it is the latter, I think you're hearing the government saying, yes, that is clearly established, that they could not, in fact, be motivated only by bad viewpoint reasons and zero by security, and therefore you have stated a claim if your complaint does say what we both just agreed you wanted to say. I don't think the government has conceded that. All right. Maybe they didn't. I have to decide that. Okay. Then I would have to decide is it the case that if the Secret Service was motivated not at all by security and 100 percent by viewpoint, does that state a claim? Now we've run into the Bivens problem, et cetera. But leaving all that out of it, the next question would be, which I haven't heard argued yet, which is why I raised this, what more do you have to do than state a claim? Five years ago, I would have thought nothing, that if you have an absurd claim, and I'm not saying it's absurd, but if it were absurd, a district court could deal with that. They would deal with it by giving you five minutes of discovery and then saying, hmm, or 10 minutes plus summary judgment, or have you really certified this under Rule 11? Are you kidding? Be careful. Or, you know, they have five or six different weapons. Now, that is what you're arguing, I think, but then along comes Iqbal. Now, it's a long way of focusing you on that question. And so in Iqbal, this Court said to be plausible, it has to be something more than possible, but plausibility is not probability. And the way we establish intent is rarely through the admission to a local law enforcement or to someone else that the agent acted for an impermissible reason. What we do to establish intent is plead facts from which intent can be inferred. We believe we have pleaded facts from which intent can be inferred, both with respect to the disparate treatment, with respect to the time that elapsed from the President's decision to dine, from the time he sat down, and then 15 more minutes until the decision was made to move the demonstrators. Well, Iqbal says a little bit more than that. Not that you just have to allege facts. In Iqbal, and just quoting here from page 681, the Court goes on to consider the factual allegations in the complaint to determine if they plausibly suggest an entitlement. And they go on to say, but given more likely explanations, they do not plausibly establish this purpose. So based on just your complaint, we have to determine whether there are more likely explanations, and we have in your complaint the idea that they're at the front of the alleyway, it's a six-foot wooden fence. Can we — we certainly can look at those in deciding not simply whether you've pled the cause of action, but whether it's more plausible than those other justifications. I think, though, once we meet a certain threshold of plausibility, unless the competing inference is so compelling to make our claim implausible that it involves at the pleading stage such a great burden that no plaintiff could ever satisfy, the Secret Service or any defendant could always articulate some rationale for their action that would create a competing inference. Kagan. Well, I think that's what we said. Situation, Wilker. Sorry to take you back to this. But in this case, do you concede that a reasonable officer, even if not these officers, these officers might have had a terrible motivation, but that a reasonable officer could look at this map and say, look at the distance between the alley and the outdoor patio. You can throw an explosive in there. That seems really bad. Let's get these people out of the way. Could a reasonable officer have said that? Could a reasonable officer have said that, that given the proximity, certainly that's a possible conclusion. I can't say that that's an impossible conclusion. But the answer to that, it doesn't, because the answer to that is to take a measured response consistent with the Secret Service's own guidelines, which is not to take viewpoint into account, to be respectful of those First Amendment rights of people who are demonstrating on the public streets in the center of town. This is poor. You conceded that there would be a security interest in the hypothetical that Justice Kagan raised, that the people are in front of that alley where they could throw a grenade. Once you concede that, then do you say, but the security interest, the valid security interest is washed away because, in fact, it was viewpoint? I think there's a distinction. Could there be a security interest? Yes, there could hypothetically be one. Was there one? We say there was not for the reasons articulated in our briefs and for the constellation of facts that we have alleged in our complaint. I'm not sure I understand that, because it seems to me there either is or isn't a valid security interest. Now, whether they acted because of that valid security interest is, of course, a different question. And you might say, well, there was a valid security interest, but that's not why they acted. But as to the first question, I mean, there either is one or there isn't one, no? And we look at, we say, what would a reasonable police officer think of the security interest here? What would a reasonable police officer do? Would he clear this area or not? The question is whether proximity alone of a peaceful group of protesters is enough to create a security. And in hindsight, you could look at that and you could conclude that. I respectfully disagree that that means there was one on the evening in question. That's a factual question. Was there in fact one? Breyer. In your complaint, the defendants claim that defendant secret service agents told Tao and the police defense that the reason for the secret service's request or direction was that they did not want anyone within handgun or explosive range of the President. To the extent the agents, in fact, made such an assertion, the assertion was false, and the defendant, Tao, and police defendants knew or should have known that it was false. So you think it's false. They think it's true. That's called a dispute of fact. And the normal circumstance is that the judge has various weapons at his disposal, legal weapons, to try to prevent, to try to prevent courts' time being wasted, officers' time being wasted, and others' time being wasted on factual allegations that are unlikely to be true. That was true before Iqbal as well as after. That's your position. Is that right? Yes and no. I mean, I think unlikely may be the wrong word. In this case, the court in Sorkowitz said it doesn't matter whether the case – it's not a question of whether the case is likely to be proven true. The question is have you pled enough. Now, clearly that preceded Iqbal. But Iqbal didn't purport to change that calculus. Ultimately, we are still at the pleading stage. We believe we have pled enough facts to create a basis for the inference of intent. But what about the situation, which is similar to your case, but not exactly similar, not exactly the same, that you don't plead any evidence of direct intent, any direct evidence of intent on the part of the officers. But you have two groups. One is pro, one is anti. And the officers put one group one place, one group the other place. Now, the distance from the President to the two groups is not the same. One is somewhat closer. One is somewhat farther away. The things that are in between the group and the President are different. Maybe in the group that's further away, you might think the things are – one might think that there are fewer obstructions, maybe there are more obstructions on the other side. So you plead that the placement of the anti group was less favorable than the placement of the pro group. And is that enough? We acknowledge that's not enough under this Court's precedent. What more would you need? We do need to allege personal participation and intent. We understand that. You plead intent. Would you be – if you pled intent based just on the disparate impact, would you be in violation of Rule 11? I don't think we'd be in violation of Rule 11. I don't know that under Iqbal that that would be enough. I think prior to Iqbal that would have been enough. Well, what more would you need? I think you need other evidence from which you can infer an intent, and we've pled other evidence. One is the time that elapsed from the time the decision was made, which lessens the – which suggests and supports the inference – supports the inference that it wasn't a security-based determination, but in fact was based on viewpoint animus. Just to make sure, are we talking about 15 minutes? We're talking about both. Between when and when. So we're talking about the time the President made the decision and the initial security arrangements were made, approximately at 7 o'clock. Right. Then the President sat down at approximately 7.15, and then another 15 minutes elapsed before the decision is made to move the antithemonstrators. And the first – they first cleared the alley, right? Yes. And then the movement that you're concerned about. Right. Now, doesn't it make sense, just hypothetically, if you're the Secret Service agent, you suddenly have this challenge dropped in your lap at the last minute, you say, okay, here's the thing. First thing we've got to do is clear the alley, right? Because that's right up against where he's standing. So you take care of that. You clear the alley. Then, after you have more time to assess the situation, you say, okay, now we've got to get these people who are at the foot of the alley. We've got to move them. In other words, they had to act not in an emergency situation, but reasonably quickly, and they did it step by step. And we understand that's the competing inference that the government has offered here. We respectfully disagree that on the facts that we've alleged, that that's so compelling that it renders our allegation implausible. But here's where we get back to Iqbal. It doesn't have to be so compelling. It simply has to be more likely, is the quote from Iqbal on 681. And it has to be an obvious alternative explanation. And that's enough, no matter what you've alleged. But we rely on the language elsewhere in Iqbal, which we think has to be read together, which is plausibility doesn't mean probability. And so if the contention is that if there's a more likely explanation, ours is then we're being held to a probability standard that this Court said we weren't being held to on a pleading standard, and which we would suggest to the Court is not consistent with Rule 8, with a short and plain statement of the claim. Again, we haven't had an opportunity to develop a factual record here. Breyer. How do you do that? Because I want to follow up on just what the Chief Justice said. Imagine that what he just said is the real case. You have a client, imagine, who's quite sincere, absolutely sincere, and really feels it was very badly treated, and you can sign a Rule 11 statement. But suppose that the facts are just what he said. Then suppose that Iqbal were not the law. Forget Iqbal for the moment. Now, you've got my hypothetical. I think so. All right. What weapons does the district judge have, which I have so blithely been assuming, to prevent a waste of time by the Secret Service, a demoralization of the service leaning in the direction of being overly careful and therefore risking the President? What procedural weapons does the present law absent Iqbal give him to dispose of a case quickly, without disturbance, if the true facts are what the Chief Justice said? Well, I think there has to be some opportunity to develop a factual record. And the trial courts have ample authority to control discovery under the rules of civil procedure. So discovery is your answer, and of course it is. You've got allegations that are going to the trial. The first thing you're going to do is file interrogatories. You're going to file requests for admission. You're going to file discovery requests to the Secret Service. And the district court's going to have to allow some of that, isn't he, if he's allowed your allegations to go forward? I think the Court would have to permit us to engage in some discovery of the agents regarding are there reports of the events of the evening. Do they admit certain facts or deny them? Should we have an opportunity to take brief depositions of the agents? And I think those are appropriate steps. That's not full and unbridled discovery. The rules already limit discovery to a certain degree. They present a presumptive limits on depositions. And what about the stuff of the study? Actually, the first thing you would want to know is whether this was a departure from established policy. So the first question in if I were drafting interrogatories would be what is your policy with respect to moving demonstrators at a presidential event? What do you do? And I can see the Secret Service saying, well, that's kind of a bad thing to make it public, because there are people out there who want to kill the President. And if you go through your discovery and say this is how we look at that situation, this is what we do, that gives people a guideline for how to break through the security arrangements. Well, the trial courts, the district courts, also have ample authority to enter protective orders. There has been no assertion that the information that would be required here, and We don't know because we haven't gotten to that stage, and I think it's premature to get to that stage, whether there would be any claims of secrecy that would limit what we could or could not do in the context of discovery. But those are matters that can be best addressed by the district court in the first instance and can be addressed by the normal and appropriate means that district courts use all the time to address sensitive information when it's presented as part of a lawsuit in Federal court. Alitoso, then what happens if a district court does allow discovery of things that the Secret Service thinks are confidential? How far should demonstrators be away from the President? How high must a fence be before we think that it provides security against a thrown object? Suppose a district court allows discovery of all that. What are they supposed to do? They have to file a mandamus petition with the court of appeals and get the court of appeals, try to persuade the court of appeals to review a discovery order? I think that ultimately is one remedy and it's a remedy provided for on our system whenever we have an issue in which sensitive information may be involved in connection with a Federal lawsuit. It's not an answer to say that simply because there might be some information that the Secret Service would rather not share that that should stop us in our tracks to begin with. Those are the kinds of determinations that a district court should be trusted to make in the first instance and which district judges make every day in this country. Ginsburg. In Judge Brisson's opinion, she seemed to think it was very important that when the President got into the motorcade to leave, only one side had access. So leaving aside what happened when the group was moved, would you take the position that not moving them back before the President left was a violation of their First Amendment rights? We have not taken that position. We have not asserted that they had, that there was an obligation to hold the President in position so that the demonstrators could be moved back to their former position. Our position is they shouldn't have been moved in the first place because there wasn't a valid security reason and that the reason they were moved was solely because of the viewpoint they were expressing. And the fact that that's not a separate claim that they weren't moved back, but it is an indication that they were removed from where the President would be passing, in our view, that supports the inference of viewpoint. Is that right? And the question of mixed motive or improper motive, if we can get back to that for just a minute. Assume that the law, and this is the Wren case, is as follows. If there is improper motive for an arrest, but that there was an objective basis that would have made the arrest and that did make the arrest reasonable, there is no violation of the Constitution. Assume that's the law. And forget clearly established, forget it all. Assume that's the law. It seems to me that for you to prevail, you have to say we should make a First Amendment exception because the First Amendment is so important or that there has to be in another context an amendment for racial profiling. So the rule that I have just stated has to be qualified in some way. It seems to me you almost have to say that in order to prevail in this case. I would suggest to you that Wren is the exception, that Wren in the Fourth Amendment context that says if there is an objective basis, I think that's reflected in Reichle. But as the Court in Iqbal noted, in the First and Fifth Amendment context, at least in the context of State actors, the Court has held that invidious intent is a basis for liability, intent to violate those constitutional rights as a basis. And so, excuse me, I'm not sure, if you stop a car because you think the participants in it were coming back from a protest against President Bush, is that a Fourth Amendment case or a First Amendment case, if that's your allegation? The only reason the car was stopped was because of the viewpoint that these people had. Is that a Fourth Amendment case or a First Amendment case? No, that would be a First Amendment case. Yes, I would think so. And you think that so long as you make that First Amendment allegation, it doesn't matter if you have a broken taillight? I think for the terms of the First Amendment claim, it wouldn't matter if the circumstances demonstrated and created a basis for that inference of intent. Well, just out of curiosity, was there anything to prevent someone from leaving one of these groups and going over to the other group? There was after the President made the decision. The allegations in the complaint state that the local law enforcement restricted movements between the two groups after the security perimeter was established. Somebody couldn't have just walked away and taken a circuitous route and gone to the other group? That would have been the police would have stopped them from doing that? Is it theoretically possible that they could have taken a large enough circle around there? I think that is a theoretical possibility. But the police did in fact stop movement across Third Street. One of the factors that we haven't addressed today is the Secret Service's actual policy and practice that we have alleged in our complaint. And that plausibly and convincingly supports the inference of intent here. We have alleged not less than 12 other incidents during the first four years of the Bush Administration in which Secret Service agents were involved in viewpoint suppression activities. Now, we haven't proven those. But again, we're at the complaint stage. That allegation, along with the official policy of the Bush White House to suppress dissent at presidential appearances, also supports the inference that these officers were acting for a viewpoint suppressive reason. I suppose you would then seek discovery with respect to those 12 other episodes. Because you're saying those are viewpoint discrimination. How can you decide until you know the facts of those? We would seek certain limited discovery with respect to those incidents to see if they bear out the allegations that we've made. The same range of things we talked about earlier. Interrogatories, requests for production, discovery, with respect not just to your case but to the 12 others. To the extent that Secret Service denies that those allegations or that these officers deny those allegations in an answer, which we haven't yet seen. You wouldn't seek limited discovery. You would seek unlimited discovery. You might get only limited discovery. I'm not sure I would seek unlimited discovery because then I might be overburdened with material that would have no relevance to the case. What we would seek is information sufficient to draw conclusions about those events and whether they are sufficiently similar to support the inference we would seek to establish in this case that these officers, these agents acted with the intent we've alleged they acted with. The sole intent. The sole intent. If there are no further questions. Thank you, Counsel. Mr. Gershengorn, you have four minutes remaining. Thank you, Mr. Chief Justice. A couple of points. First, I think, Justice Kagan, in response to your hypothetical, the concession that in hindsight there may have been a valid security rationale ends this case. Because if it was true in hindsight, it was certainly true at the time in the kind of rapid decision-making that was called for, as the Chief Justice alluded to. I think at that point the case is over in our favor. Second, the kinds of discovery that my friend on the other side. Could I just clarify a factual matter? There are two alleyways. There was one on Third Street that the President went into, and then there is one by the patio dining room. What access was there between Fourth Street and the patio? Because I thought that the alley was on California Street. The entrance to the alley was on California Street. The entry to the alley is on California Street. That's the one where the anti-Bush demonstrators were. The alley that the motorcade went through, which is on Third Street, which is neither group of protesters could get to because the police had blocked off traffic north of California Street. So no demonstrators could get there at all. If I could return on the discovery point. The discovery that my colleague has suggested he would seek is exactly the nightmare scenario that the Secret Service fears. It's exactly what qualified immunity is designed to prevent. When there is a legitimate security rationale, discovery into what the agents were thinking, what the Secret Service's policies for is exactly what there shouldn't be. It's exactly what the Court said in Hunter that it didn't want, which is agents hesitating before they did their job. Third. Ginsburg. Ginsburg. Hone, suppose it's originally set up by the police. The motorcade is coming down. Each side has roughly equal access. Then the Secret Service comes along and said, clear the anti-Bush demonstrators. Suppose that those were the facts. Would there be a valid livings claim? Your Honor, the question would depend on whether there was a valid security rationale. I think in the context of a motorcade. It's more likely that the people who are against the President will be harmful to him than the people who are for him. Your Honor, I think that would be a much more difficult case in the context of a motorcade where the security of the President is much different than when the President is on an outdoor patio separated only by a small fence. And I do think that that is one of the major differences between where the treatment of the pro-Bush protesters, the anti-Bush protesters here, is that the allegation that could be based on differential treatment because the pro-Bush protesters were in position to see the motorcade when it left. And therefore, as the complaint alleges in paragraph 55, that that somehow undermines the agent's security rationale for moving the anti-Bush protesters during the meal. It just doesn't wash. And if I could turn just very quickly, Justice Breyer, to your suggestion that the district court could control discovery. That's exactly what the Court rejected in Twombly, exactly what the Court rejected in Iqbal. As a practical matter, once that door is opened, the agents lose the security and peace of mind that they need, and they're subjected to the very burdens they shouldn't be subjected to. And then if I could just close with a quick point on the Iqbal. We don't think under the allegations here, as the Chief Justice pointed to the key passage in Iqbal, that these allegations are any more than consistent with the obvious alternative explanation. I've addressed the pro-Bush protesters. The diners are very differently situated for a security perspective because they had no anticipation of seeing the President, and the Secret Service could screen additional folks coming in. It's very different from a crowd outside an alleyway. The advance manual that the other side points to supports us, not them. What it said is — You can finish the sentence. What it says, Your Honor, is that security concerns are for the Secret Service. If it's a political concern, that's for the advance team. Thank you, counsel. Counsel. The case is submitted.